U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

**TAWANA C. MARSHALL, CLERK**
**THE DATE OF ENTRY IS**
**ON THE COURT'S DOCKET**



**The following constitutes the order of the Court.**

**Signed April 12, 2006**

**United States Bankruptcy Judge**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| EMIR ADEL CHEHAB and PRISCILLA | § | CASE NO. 04-33084-RCM-7 |
| CHEHAB, | § | |
|     DEBTORS. | § | |
| | § | |
| POTTER AVIATION, INC., and | § | |
| DAVID J. POTTER, | § | |
|     PLAINTIFFS, | § | |
| | § | |
| VS. | § | ADVERSARY NO. 05-3415 |
| | § | |
| EMIR ADEL CHEHAB and PRISCILLA | § | |
| CHEHAB, | § | |
|     DEFENDANTS. | § | |

### MEMORANDUM DECISION

This adversary proceeding was filed by Potter Aviation, Inc.

("PAI") and David J. Potter, individually ("Plaintiffs"), against

Emir A. Chehab, a Chapter 7 debtor, individually and allegedly

d/b/a Masai Aircraft, Inc., (the "Debtor"), and his wife,

Priscilla Chehab ("Mrs. Chehab").

With respect to the claims involved herein, the court has

core jurisdiction over Debtor under 28 U.S.C. § 1334(b) and § 157(b)(2)(i) and related jurisdiction under 28 U.S.C. § 1334(b) and § 157(c)(2) against Mrs. Chehab.  Both sides have expressly or impliedly consented to this court's entry of final orders in the trial against Mrs. Chehab, (Pls.' Pet. ¶ 2; Def.'s Resp. ¶ 20), and the parties conduct during trial and prior thereto.

Following are the court's findings of fact and conclusions of law under Bankruptcy Rule 7052.

### The Parties and Claims

Potter Aviation, Inc. ("PAI") is a company owned by David J. Potter, an attorney.

The claims in this adversary proceeding arise from PAI's purchase, in March 2001, of a thirty-five year old Beech Baron B-58 aircraft ("the plane") from Masai Aircraft, Inc., a company owned by Debtor.

Plaintiffs claim that in connection with the sale, Debtor made § 523(a)(2)(A) fraudulent misrepresentations to them about the plane.  If Debtor made § 523(a)(2)(A) misrepresentations to Plaintiffs, even if acting for Masai Aircraft, Inc., he would be liable for such fraud, if any. *See generally* 41 TEXAS JUR. 3D *Fraud & Deceit* § 74 at 305-07 (2004) (citing numerous cases involving principals and agents).

One problem with the case is Plaintiffs' "kitchen sink" approach to possible damage claims and remedies, *i.e.,* everything

-2-

tossed in but the kitchen sink without regard to remedies appropriately being alternative as opposed to being cumulative and without regard to who was the appropriate party to assert same.

Debtor pointed out that many of the repairs made on this thirty-five year old plane were like sending an old car back to the manufacturer for an "extreme makeover"[1] and that the engine had 900 hours on it when delivered to Plaintiffs. Mr. Potter, Jr., also testified credibly that cracks appear on an airplane normally over time and that an airplane owner needs to watch out for same.

The sale of the plane was agreed to on March 8, 2001, for a purchase price of $147,000. Out of this transaction, in their petition prayer and proposed findings, Plaintiffs come up with a total damage claim of approximately $363,000 plus a $100,000 exemplary damage claim against each Defendant, plus pre and post judgment interest. Additionally as discussed hereafter, Plaintiffs attempt to recover for repairs done on the plane after they disposed of it to their wholly owned corporation, Capstone Aviation, Inc. ("Capstone"). Capstone would own any such claims.

### Background

During February 2001, Debtor, through Masai Aircraft, Inc., his corporation, advertised the plane for sale. The plane was

---

[1]     This term is the court's interpretation of Debtor's testimony and not Debtor's precise words.

advertised as having "*no damage history*" in *Trade-a-Plane*, a
trade publication of aircrafts for sale. *See* Pls.' Ex. 36
(emphasis added). This representation was false. Debtor
verbally repeated the no damage history to Plaintiffs in
conversations prior to the sale.

Debtor claimed to have relied upon: (1) the plane logs,
which showed no damage history to the plane, and (2) the fact
that the Federal Aviation Administration ("FAA") in December 2000
had given the plane an airworthiness certificate. Expert witness
David Leslie ("Leslie"), an aircraft mechanic, credibly testified
that the plane was not as represented and had extensive damage,
and that when he examined it, it did not meet FAA or
airworthiness standards. Expert witness Nathan Kline of Priority
Aviation credibly testified that it appeared someone made an
effort to cover up damages in the way the prior plane repairs
were done. It was not shown by a preponderance of the evidence
that Debtor did any such cover up or knew of any cover up.

Debtor had paid $20,000 for the plane in Paraguay, South
America, and had owned it for only three months. He had
previously sold approximately six to seven other used planes from
Paraguay. Debtor initially met with David Potter and David
Potter, Jr., as agents of PAI, and a friend, Derrick Dwight, all
who testified at trial. At such meeting, the voluminous logs of
the plane, written in Spanish, were delivered to Plaintiffs by
Debtor prior to purchase to allow the Plaintiffs and their

-4-

mechanics to examine the logs to determine the history of the plane.[2]  The log books did not contain documentation of any damage or substantial repair to the plane due to damage to the plane.  The log books were tendered to the Plaintiffs with the intention that the Plaintiffs rely upon their content.  The Plaintiffs satisfied themselves through a Spanish-to-English interpreter that the translations in the log books were correctly translated.  Plaintiffs also relied upon the log books to reflect the true, factual history of the plane for damage, repairs, and any significant fact in the history of the plane that might affect the value or airworthiness of the plane.  There was no credible showing that Debtor "doctored" the log books or knew of any "doctoring" or incompleteness of same.

Debtor further represented to Plaintiffs that (1) the aircraft had been imported from Paraguay, South America, where it had been inspected more frequently than required in the United States, and (2) Debtor represented that the Paraguayan regulation of aircraft required that the aircraft have an inspection every six months as opposed to annually as required in the United States.  There was no controverting testimony received at trial on these two representations.

Debtor represented that the aircraft was owned for much of its history by a Beechcraft dealer in Paraguay.  There was no

---

[2]     The log books were one to two feet high.  They were not offered into evidence.

-5-

controverting testimony received in court on this issue.

The most recent entry in the plane log consisted of an FAA Airworthiness Certificate issued by a representative of the FAA, namely Orvil Kirkwood, on December 29, 2000. Mr. Kirkwood was deceased by the time of trial. There was no controverting evidence to such FAA certificate having been validly issued by Mr. Kirkwood in December 2000.

Prior to purchase, Debtor demonstrated the plane on a short flight around the airfield in Mesquite, Texas. The quoted price of the aircraft was $149,000, and it was registered in the name of Masai Aircraft.

PAI, through its two agents, expressed an interest in purchasing the aircraft subject to a further examination by an aircraft mechanic in Texarkana, Arkansas. Thereafter, arrangements were made for a scheduled inspection in Texarkana with Leslie, the aircraft mechanic. Notwithstanding that the date of examination was previously scheduled, Debtor delivered the airplane one day in advance of the scheduled inspection and pressed the mechanic to make his inspection. Leslie attempted to accommodate Debtor, but advised all concerned that he did not have the time to adequately inspect the plane. By the end of the day, eighteen minor defects were found (Pls.' Ex. 1), the most significant of which was that the right engine motor mounts were installed backwards, causing the motor to tilt downward instead

of being maintained in a level position.[3] Additional time was requested by Leslie to do further inspection, and an agreement was reached to proceed with the inspection the following day. On the following day, Leslie requested an opportunity to remove the interior seats and floorboards to examine the plane further. Debtor became visibly upset, accusing Plaintiffs of being unreasonable and of wanting to tear his airplane up when it was not necessary.

Leslie's estimated cost for such minor repairs to the plane was $4,000 to $5,000. PAI agreed to purchase the plane subject to a price adjustment to pay for repairs, which the parties agreed needed to be made. The parties agreed to share the cost of these repairs, none of which were significant enough to affect the plane's airworthiness. The price of the aircraft was reduced by $2,000 to $147,000, and PAI agreed to purchase the plane on or about March 8, 2001. Plaintiffs paid the down payment of $12,900.00. Insurance was required by the lender prior to funding, and on March 12, 2001, after an insurance certificate was delivered to the lender, the balance of the purchase price, in the amount of $134,100, was wired to Masai Aircraft's account at American Airlines Credit Union. Said funds were shortly thereafter forwarded by Debtor from such account to his own personal account in Paraguay.

---

[3] All parties agreed that these eighteen minor repairs were not that significant for a plane of that age.

Debtor required that the mechanic, Leslie, not touch the aircraft until the balance of the purchase price was received and acknowledged by Debtor directly with Leslie.  Therefore, no further inspection or work was done upon the plane until after March 12, 2001.  Debtor confirmed receipt of the wire transfer, and Plaintiffs directed Leslie to make the minor repairs promptly and as rapidly as possible so that the plane could be placed in service.[4]

Leslie began repairs, and over a period of the next few weeks, additional defects were determined to exist, a number of which were significant and costly.  Leslie determined that the plane was not, in fact, airworthy and had serious defects.  Those defects are generally identified as follows:

1.    seatbelts,[5]

2.    "nose bugs" in front of the cowlings around the propeller shaft,[6]

---

[4]    In Plaintiffs' complaint, paragraph 37(4), Plaintiffs claimed $3,732 per month damages, totaling $150,000, for loss of use of the airplane during lengthy repair time.  However, there was not a credible monetary figure proved for any such loss of use.

[5]    Both the original seatbelt manufacturer and the seatbelt company to which Plaintiffs had been referred could not replace the straps or the FAA certificates.  Without FAA approved seatbelts, the plane could not be legally flown.

[6]    There had been modifications, unauthorized by the FAA and the manufacturer, to the nose bugs in front of the cowlings around the engines.  Leslie was unable to complete this repair, and the aircraft was transferred to Raytheon Maintenance Facility ("Raytheon") in San Antonio, Texas.  Cost of this repair, including work done by Leslie and Raytheon totaled $11,687.68.

-8-

3.    alternate air boxes[7] and air ducts,[8]

4.    right wheel,[9]

5.    carry through spar,[10]

6.    right E.G.T.,[11]

7.    left brake,[12]

---

[7]    An alternate air box is a safety requirement to be used in the event the primary air supply to the engine carburetor is clogged or blocked for any reason.  The alternate air boxes for both engines had been removed as well as the air ducts from the air boxes to the engines.

[8]    The unauthorized modifications to the alternate air boxes and air ducts required Plaintiffs to purchase such devices and have them installed, for a total cost of $648.72 plus applicable taxes.

[9]    While replacement of the right tire was anticipated pre-purchase, upon removal of the tire, the wheel was determined defective.  The cost to replace the wheel totaled $1,002.50, including labor and supplies.

[10]    The carry through spar is the brace to which the wings of the plane are attached.  It is a major structural component of the plane, assuring safety of the craft.  Failure of this device would cause the wings to fold and the plane to crash.  A closer inspection by Leslie of the carry through spar revealed three major cracks, in addition to the damage caused by the landing gear.
    As a result of the damage to the carry through spar, Plaintiffs hired DRB Aviation Consultants of San Antonio, Texas, to examine the spar and to design a repair approved by the FAA.  Plaintiffs paid the consultants, including transportation costs, $2,250.00.  From their inspection, the engineers concluded that the plane had crash landed when the landing gears had not been fully extended when the plane had landed.
    Raytheon repaired the carry through spar for $19,926.73.  In sum, the carry through spar repair, including the inspectors fee and Raytheon's repairs, totaled $22,176.73.

[11]    Repaired by Raytheon at a cost of $79.20.

[12]    Repaired at a cost of $216.00.

-9-

8.   propellor spinner,[13]

9.   engine,[14]

10.  rear seats and tracts,[15]

11.  fuel leak,[16]

12.  landing gear box,[17]

13.  propellers,[18]

14.  thirteen other minor defects.[19]

--------

[13]    It was discovered that the propellor spinner had received unauthorized parts and therefore had to be replaced.  Regulations required that both spinners be replaced, which was done at a charge of $2,012.94.

[14]    Raytheon initially inspected the engine and discovered a defect, warranting the engine to be removed and disassembled to determine the cause of such defect.  Raytheon's charges for this service totaled $5,435.45 plus applicable tax.  The engine was then shipped to and repaired by Firewall Forward at a total cost of $7,921.00.

[15]    There had been unauthorized modifications to the rear seats.  Raytheon made the necessary repairs for a total cost of $7,537.60.

[16]    The replacement of the fuel cells in both wings as well as repairs to the wing bay fuel liners by Raytheon totaled $18,066.75.

[17]    The landing gear box was repaired by Raytheon for a charge of $4,117.44.  However, the determination to overhaul and repair the landing gear box was a result of the damage to the landing gear.

[18]    In the process of removing the right engine and spinner from each propellor, it was determined that the propellers needed an overhaul.  A close inspection of the propellers revealed that they had been cracked and oil had leaked from both.  Oil was not currently leaking.  Raytheon charged $11,115.42 for overhaul of both propellers.  It is unclear from the record made whether all of such Raytheon charges were paid by Plaintiffs or whether some were released as part of the Raytheon settlement discussed hereafter.

[19]    These defects included: repair of the right wheel and front spar webbing, replacement of the mount bracket on the flap motor, landing gear inboard rods, right propeller control cable, left engine forward drain valve, duct on left engine and left alternate

-10-

On March 13, 2002, after Raytheon had completed all repairs, the plane was required to have another annual inspection. It had been approximately one year since Plaintiffs' purchase of the aircraft and since the plane had received the FAA Certificate of Airworthiness and further repairs were needed.

When the plane was delivered to Raytheon, the original manufacturer of the plane, for repairs, the extent of the plane's deficiencies were unknown to Plaintiffs. Raytheon gave Plaintiffs notice of other deficiencies, which caused the repair costs to mount to $108,000. That amount was negotiated down to $91,316. PAI and Raytheon engaged in intensive litigation for a year over Raytheon's bill. PAI then agreed to drop the litigation against Raytheon in return for Raytheon voiding its $91,316 repair bill, which proposal settled the Raytheon litigation.

On page 16 of Plaintiffs' petition it is stated:

At the conclusion of [the Raytheon] litigation and the release of all claims by Raytheon, the aircraft was conveyed to Capstone Aviation Inc., an Oklahoma Corporation wholly owned by the stockholders of Potter Aviation. The first mortgage bank loan of Potter Aviation, fully guaranteed individually by Plaintiff David J. Potter, was refinanced by the same bank for Capstone Aviation, Inc. on the condition that Plaintiff David J. Potter personally guarantee said promissory note of Capstone Aviation, Inc. Therefore, David J. Potter has been required to continue to fund the repair and other expenses incurred as a result of the fraud

---

air cable, installment of new brake dynamic, relocation of ELT switch, repair of left wheel well and baggage area. These repairs, replacements, and installments totaled $10,032.67.

through misrepresentation of Defendant, Emir Adel
Chehab.

This lengthy quote from Plaintiffs' petition is inserted because
it is a judicial admission by Plaintiffs that after the
conveyance to Capstone Aviation, Inc., the plane was owned by
Capstone, and Plaintiffs could have no claim for any further
repairs to the plane, for example, the alleged repairs by
Priority Aviation, Inc., of Mena, Arkansas.  Such repairs might
have some tendency to show the condition of the plane or its
value amount, but could not be sought as any legitimate out of
pocket claim of Plaintiffs.

#### **Plaintiffs' Claim Against Mrs. Chehab**

There was no showing that Mrs. Chehab had any personal
dealings with Plaintiffs nor under the record made was there any
showing that she had any dealings with Masai Aircraft.[20]

Plaintiffs claim that she has liability for the alleged
obligation to Plaintiffs by reason of § 3.202(d) of the Texas
Family Code, which states:  "All community property is subject to
tortious liability of either spouse incurred during marriage."
TEX. FAM. CODE ANN. § 3.202(d) (Vernon 2005).

Section 3.202(d) does not require that the plaintiff seeking
recovery for tortious conduct of a married party join such
party's spouse in a suit in which recovery is sought.  *Anda v.*

---

[20]     There was also no showing that Debtor was Mrs. Chehab's
agent, partner, or joint venturer in any relationship with
Plaintiffs.

-12-

*Blake*, 562 S.W.2d 497, 501 (San Antonio Civ. App. 1978). The statute does not require that a judgment against a married party be entered jointly and severally against the two spouse's community estate. *Id.*; 39 TEXAS JUR. 3D *Family Law* § 318 at 362 (2004) (discussing tort liability incurred during marriage). Plaintiffs' claims against Mrs. Chehab are dismissed.

## § 523(a)(2)(A) Analysis

Section 523(a)(2)(A) of the Bankruptcy Code provides that a debt will not be discharged in bankruptcy if it is "for money, property, services, or an extension, renewal, or refinancing of credit," to the extent that it was "obtained by false pretenses, a false representation, or actual fraud." 11 U.S.C. § 523(a)(2)(A). The burden of proof under § 523(a) is by a preponderance of the evidence. *First Nat'l Bank of Byers, N.A. v. Slonaker (In re Slonaker)*, 269 B.R. 595, 602 (Bankr. N.D. Tex. 2001) (citing *Grogan v. Garner*, 498 U.S. 279, 287-88 (1991)). Plaintiffs have such burden. *Williams v. Zachary (In re Zachary)*, 147 B.R. 881, 883 (Bankr. N.D. Tex. 1992) (citing *Grogan*, 498 U.S. at 279).

"[T]he operative terms in § 523(a)(2)(A), . . . 'false pretenses, a false representation, or actual fraud,' carry the acquired meaning of terms of art . . . [and] are common-law terms." *Field v. Mans*, 516 U.S. 59, 69 (1995). "[W]here Congress uses terms that have accumulated settled meaning under

. . . the common law, a court must infer, unless the statute
otherwise dictates, that Congress means to incorporate the
established meaning of these terms". *Id.* (internal quotation
marks and citations omitted). "Actual fraud, by definition,
consists of any deceit, artifice, trick or design involving
direct and active operation of the mind, used to circumvent and
cheat another--something said, done or omitted with the design of
perpetrating what is known to be a cheat or deception."
*RecoverEdge v. Pentecost*, 44 F.3d 1284, 1293 (5th Cir. 1995)
(quoting 3 COLLIER ON BANKRUPTCY ¶ 523.08[5], at 523-57 to 523-58
(footnote omitted)).

The Fifth Circuit espoused in *RecoverEdge* the five factor
test, governing the actual fraud discharge prohibition under
§ 523(a)(2)(A). *Id.* at 1293. Under *RecoverEdge*, the creditor
must prove:

(1) the debtor made representations; (2) at the time
they were made the debtor knew that they were false;
(3) the debtor made the representations with the
intention and purpose to deceive the creditor; (4) that
the creditor relied on such representations; and (5)
that the creditor sustained losses as a proximate
result of the representations.

*Tummel & Carroll v. Quinlivan (In re Quinlivan)*, 434 F.3d 314,
317 (5th Cir. 2005) (citing *RecoverEdge,* 44 F.3d at 1293).

Furthermore, "[w]hen one has a duty to speak, both
concealment and silence can constitute fraudulent
misrepresentation; an overt act is not required." *AT&T Universal*

-14-

*Card Servs. v. Mercer (In re Mercer)*, 246 F.3d 391, 404 (5th Cir. 2001) (citations omitted).  "One party to a transaction who by concealment or other action intentionally prevents the other from acquiring material information is subject to the same liability to the other, for pecuniary loss as though he had stated the nonexistence of the matter that the other was thus prevented from discovering."[21]  Restatement (Second) of Torts § 550 (1977).

Plaintiff must prove the third element, the scienter requirement.  Debts satisfying this element are

> debts obtained by frauds involving "moral turpitude or intentional wrong, and any misrepresentations must be knowingly and fraudulently made."  An intent to deceive may be inferred from "reckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation." *Nevertheless, an honest belief, even if unreasonable, that a representation is true and that the speaker has*

---

[21]  The Comment a to § 550 states:

The rule stated in this Section is commonly applied in two types of situations, although it is not limited to them.  The first occurs when the defendant actively conceals a defect or other disadvantage in something that he is offering for sale to another.  Thus a defendant is subject to liability for a fraudulent misrepresentation if he paints over and so conceals a defect in a chattel or a building that he is endeavoring to sell to the plaintiff, and thus induces the plaintiff to buy it in ignorance of its defective character.  So also, he is subject to liability if he reads a contract to the plaintiff and omits a portion of it, or if he so stacks aluminum sheets that he is selling as to conceal defective sheets in the middle of the pile.

Restatement (Second) of Torts § 550 cmt. a (1977).

-15-

> *information to justify it does not amount to an intent*
> *to deceive.* Thus, a "dumb but honest" defendant does
> not have scienter.

*Gen. Elec. Capital Corp. v. Acosta (In re Acosta)*, 406 F.3d 367,

372 (5th Cir. 2005)(citations omitted)(emphasis added).

In the case of *Merchants National Bank v. Moen*, 238 B.R.

785, 791 (BAP 8th Cir. 1999), the court stated:

> For purposes of section 523(a)(2)(A), a "misrepre-
> sentation" denotes "not only words spoken or written
> but also any other conduct that amounts to an assertion
> not in accordance with the truth." *In re Melancon*, 223
> B.R. 300, 308-09 (Bankr. M.D. La. 1998) (quoting
> Restatement (Second) of Torts § 525, comment
> (b)(1976)). . . .

The court further quoted § 526 of the Restatement (Second) of

Torts (1976):

> Section 526 of the Restatement provides that:

> A misrepresentation is fraudulent if the maker (a)
> knows or believes that the matter is not as he
> represents it to be,(b) does not have the confidence in
> the accuracy of his representation that he states or
> implies, or (c) *knows that he does not have the basis*
> *for his representation that he states or implies.*
> Restatement (Second) of Torts § 526 (1976).

*Id.* at 792 (emphasis added).

The last prong from *Recoveredge* requires that the creditor

sustain losses as a proximate result of the debtor's

representations.

It appears that Debtor made the following remaining

representations to Plaintiffs that were possibly actionable under

§ 523(a)(2)(A). First, the advertisement for the plane stated

-16-

that the plane had no damage history.  Second, Debtor repeated
this representation regarding no damage history verbally to
Plaintiffs.  Third, Debtor made an implied representation that
the log books were accurate in showing the true damage factual
history of the plane and any significant fact in the history of
the plane that might affect its value.

The underlying issue is whether Debtor had the basis for
each representation that he stated or implied in such
representations aforementioned.  *See Merch.'s Nat'l Bank*, 238
B.R. at 792, Restatement (Second) of Torts § 526 (1976). From the
record made, Debtor apparently relied on the information
contained in Kirkwood's December 2000 FAA Airworthiness
Certificate and the log books themselves.  Debtor owned the plane
for three months.

Debtor made such representations.  Plaintiffs relied on
same.  There was insufficient proof that at the time Debtor made
such representations he knew they were false or that he made such
representations with the intent and purpose to deceive
Plaintiffs.

There was insufficient proof of Debtor's commission of a
§ 523(a)(2)(A) offense or Plaintiffs' entitlement to actual or
exemplary damages.

-17-

Judgement will be entered in accordance with the foregoing memorandum decision.

###END OF MEMORANDUM DECISION###